TAB A

LEXSTAT 10-16 MEALEY'S LITIG. REP. REINSURANCE 7

Copyright 1999 Mealey Publications, Inc.
Mealey's Litigation Report: Reinsurance

December 30, 1999

*10-16 Mealey's Litig. Rep. Reinsurance 7 (1999)*

**SECTION:** Vol. 10; No. 16

**HEADLINE:** CONFIRMING CONFIDENTIAL ARBITRATION AWARDS IN "OPEN COURT"

**BODY:**

If a party moves or petitions a court to confirm, modify, or vacate a reinsurance arbitration award, does the award automatically become a "public record"? Many parties to an arbitration assume that the award will lose its confidentiality if the parties wind up in court, even if they're only confirming an undisputed award. To the contrary, a joint application to seal the proceedings may keep the award out of the public record, even though U.S. courts operate under a presumption that all court records are publicly available.

The following article discusses how U.S. courts would view an application to seal, and how the presumption favoring public access can be overcome. The article also reviews ARIAS-U.S., RAA, and Reinsurance Dispute Resolution Task Force forms, and proposes an additional stipulation for reinsurance arbitration confidentiality agreements.

The views expressed below are the author's alone. While he takes full responsibility for any errors or misstatements, the author acknowledges and thanks several arbitrators who commented on and improved earlier drafts.

\* \* \*

From demand to award, reinsurance arbitration is as confidential as the parties want it to be. Indeed, at a time when privacy is hard to come by, one of the chief advantages of arbitration is the parties' ability to keep their differences out of the public eye. Or, as Robert Huggins, a veteran of more than sixty reinsurance arbitrations puts it: "You can have your fight in the kitchen, and not in the front yard with the neighbors watching."

Although few reinsurance contracts require that the parties maintain confidentiality during an arbitration, it's customary to do so. See Jonathan Bank and Patricia Winters, Reinsurance Arbitration: A U.S. Perspective, JOURNAL OF INSURANCE REGULATION, at 3 (March 1998). Why is this practice almost universally recognized?

The reinsurance community favors keeping arbitration awards confidential for the following reasons:

\* U.S. arbitration awards aren't "reasoned" decisions, and don't contain a recitation of the facts underlying the award. Without the facts, you can only speculate about how the Panel arrived at its decision;

\* Even though you may never know how the Panel arrived at its award, human nature links the Panel with the result. This, therefore, may skew the search for an umpire or arbitrator in disputes involving similar issues;

\* Many reinsurance arbitrations implicate other confidential agreements, such as a cedant's settlement with its policyholder, thus creating a contractual obligation of the ceding company to maintain confidentiality;

\* "Publishing" arbitral awards invites third-parties to seek discovery on issues only tangentially involved in the arbitration;

\* Keeping the arbitration proceedings and the award confidential furthers another goal of arbitration, i.e., the resolution of disputes without locking the parties into positions, or destroying business relationships; and

\* Using awards as precedents makes reinsurance arbitration look and feel more like litigation, and less like alternative dispute resolution.

See generally, Robert Mangino, Arbitration - The Avoidance of Litigation..., INSURANCE ADVOCATE, (Oct. 23, 1999); Nick Pearson, Why Reinsurance Arbitration?, ARIAS U.S. QUARTERLY, 1, 4 (2d/3rd Qtr. 1999); George Gottheimer, Reinsurance Arbitration: An Arbitrator's View, REINSURANCE LAW AND PRACTICE, 546 P.L.I. 309 (1996).

It's been suggested that the reinsurance industry should "rethink" confidentiality, particularly with respect to awards involving commonly encountered contract wordings, i.e., provisions concerning allocation, aggregation, concurrent policies, continuous losses, or "stacking." See Barry Leigh Weissman and Michael Annis, Should Reinsurance Arbitration Decisions be Confidential?, MEALEY'S LITIGATION REPORTS: REINSURANCE, Vol. 6, No. 21 (March 13, 1996). Those favoring making arbitrators' decisions available argue that the awards often "leak out" anyway, or become common knowledge when a "party appeals an arbitration award, the award and reasons [are] discussed in open court; [and] in the process the award becomes part of the public record." Id.

Others argue that publishing awards would allow the parties or others to cite them for collateral estoppel or issue preclusion purposes. Along these lines, the editor of Lloyd's List International offered last year to publish any maritime arbitration award, but without revealing the identity of the parties or the arbitrators. See Phil Parry, Publication of Arbitration Awards One Way to Greater Transparency, LLOYD'S LIST INTERNATIONAL, April 1, 1998. Some advocate a "New Age" arbitration agreement that would provide that "no portion of the arbitration proceeding or any interim and final award shall be confidential." Mark Kareken, The New Age of Arbitration Requires a New Age Arbitration Agreement, MEALEY'S LITIGATION REPORTS: REINSURANCE, Vol. 10, No. 13 (November 11, 1999).

It's true that in certain circumstances, publicly available arbitral awards -- both confirmed and unconfirmed -- may be used for collateral estoppel or issue preclusion purposes in future litigation. See generally, Michael Knoerzer, The Preclusive Effect of Arbitration Award, MEALEY'S LITIGATION REPORTS: REINSURANCE, Vol. 6, No. 16 (December 20, 1995). But there's no guarantee that a court will give preclusive effect to an award, whether confirmed or not. See *Vandenberg v. Superior Court of Sacramento County, 1999 Cal. LEXIS 5537 (Sup. Ct. 1999)* (California Supreme Court refused to give arbitration award collateral estoppel effect in a subsequently litigated coverage dispute even though the arbitral award had been: (1) confirmed in state court; and (2) issued by a retired United States district court judge!); but see, *Jacobson v. Fireman's Fund Ins. Co., 111 F.3d 261 (2d Cir. 1997)* (unconfirmed arbitrator's "appraisal" could have res judicata effect).

You might add to or subtract from our list of reasons to keep an arbitral award confidential, but for the purposes of this article we'll assume that the parties want to keep the award confidential. We'll further assume that the parties don't want the award published or circulated, even if one of the parties goes to court to confirm, modify, or vacate it.

Even, however, if both parties agree to keep the award under seal, a U.S. court may disagree. In one recent case, a New York Supreme Court Justice granted the parties' joint application to seal a proceeding to confirm an arbitration award, but muttered while signing the order that he was never "happy" about sealing court records. In order to understand why a sealing order isn't a "gimme," we have to look at how U.S. courts view a request to keep an award under wraps.

The U.S. View

U.S. courts favor public access to their records. See *DiRussa v. DeanWitter Reynolds, Inc., 121 F.3d 818, 826 (2d Cir. 1997)*. This presumption can be traced back to James Madison, the Federalist Papers, and the "common law right to inspect and copy judicial records." *In Re National Broadcasting Co., Inc., 653 F.2d 609, 612 (D.C. Cir. 1981)*. A criminal defendant's Sixth Amendment right to due process and the press's First Amendment rights may also favor opening up certain court records. Watergate, ABSCAM, Monicagate, and the 11:00 o'clock news breathed new life into these principles.

Nevertheless, all U.S. courts have general "supervisory power over [their] own records and files," and may seal certain records. See *Nixon v. Warner, 435 U.S. 588, 598, 98 S. Ct. 1306, 1312 (1978)*. Exceptions to the general rule favoring public access include documents or proceedings containing trade secrets, details of sex-related crimes, crime victims' identities, jurors' names and addresses, hospital records for those who voluntarily enter drug abuse or treatment facilities, and judicial or professional disciplinary proceedings. See generally, Debra Landis, Public Access to Records and Proceedings of Civil Actions in Federal District Courts, *96 A.L.R. Fed. 769* (1990); Kristine Karnezis, Restricting Public Access to Judicial Records of State Courts, *84 A.L.R. 3d 598 (1974)*. Many U.S. courts also have specific statutory authority to seal confidential records during the discovery process. See, e.g., Fed. R. Civ. P. 26(c); N.Y. C.P.L.R. § 3103 (McKinney 1999).

None of these exceptions apply to litigated reinsurance disputes, or to proceedings to confirm, modify, or vacate an award. In a litigation, reinsurance documents have no greater protection than any other materials produced during a civil action. See *Aetna Casualty and Surety Co. v. Certain Underwriters at Lloyd's London, 676 N.Y.S. 2d 734* (N.Y. Sup. Ct., 1998), aff'd, *692 N.Y.S. 2d 384 (1st Dept. 1999)*. The Aetna case illustrates how U.S. courts struggle with requests to keep materials under seal when reinsurers and cedants litigate, rather than arbitrate, their differences.

In Aetna, Lloyd's inadvertently produced certain records, including notes and materials generated during meetings and "workshops" of an "Environmental Claims Reinsurance Group" ("ECRG"). Some ECRG meetings discussed arbitrations relating to reinsurance claims. *676 N.Y.S.2d at 735*. Lloyd's wanted the materials returned; Aetna refused.

Aetna and Lloyd's had stipulated to keep documents exchanged during the case confidential, but a "mere stipulation" doesn't automatically protect materials once filed in court, particularly if the court considers the material to reach a decision. See, e.g., *Greater Miami Baseball Club Partnership v. Selig, 955 F. Supp. 37, 39 (S.D.N.Y. 1997)* (N.Y. Times obtained a copy of the Baseball Commissioner's deposition in a dispute involving the Florida Marlins even though the parties had agreed that all discovery-related documents would be confidential).

The trial court in Aetna, Justice A, had to rule on whether the inadvertently disclosed documents should be returned. Justice A ordered Aetna to return some of the documents, but allowed Aetna to keep some of the material. On his own, Justice A then sealed the entire record "in light of the numerous issues throughout the file" relating to confidential matters. *676 N.Y.S.2d at 736*. These "confidential matters" included Aetna's settlement agreement with its insured in an underlying coverage dispute. Because the entire file was now under seal, Justice A's decision regarding the ECRG notes was also sealed.

Justice A died. Lloyd's moved to reargue Justice A's order concerning the return of the ECRG materials. Aetna opposed Lloyd's motion and moved to unseal Justice A's decision. Aetna argued that it should be allowed to show Justice A's decision to other courts for collateral estoppel purposes if similar issues concerning the ECRG notes came up in other litigation. All of these motions went to Justice B, who granted Aetna's request, unsealed the record, and allowed Justice A's order on the ECRG notes to be published.

Justice B began his analysis by citing cases that hold that while the public has an interest in the disclosure of court files, the "public's right to inspect and copy judicial records is not absolute nor unrestricted, and is a matter of judicial discretion." *Aetna, 676 N.Y.S.2d at 737* (quoting *Crain Communications, Inc. v. Hughes, 521 N.Y.S.2d 244* (1st Dept. 1987), aff'd, *74 N.Y.2d 626, 541 N.Y.S.2d 971* (1989)). A New York court's discretion, however, is governed by New York's Uniform Rules for Trial Courts, which state the circumstances under which a court may seal its records. See N.Y. Uniform Ct. Rules, § 216.1(a) - McKinney's (West 1999).

In New York, unless a statute or rule provides otherwise, "a court shall not enter an order in any action or proceeding sealing the court records" unless the court issues a "written finding of good cause" that sets forth the grounds for the sealing order. See Id. Uniform Rule 216 doesn't define "good cause," but instructs the court to "consider the interest of the public" and, where . . . necessary" give notice and opportunity for the public to be heard. See Id.

The Aetna case underscores several points. First, stipulating to confidentiality in a litigated dispute doesn't guarantee confidentiality once the parties (or their documents) arrive in court. Second, although U.S. courts have the discretion to seal records, judges work within a presumption that the "public has a right to see and copy judicial records," a presumption that "cannot be easily overcome." *FTC v. Standard Financial Corp., 830 F.2d 404, 412-13 (1st Cir. 1987)*. Third, specific statutes or court rules often determine how judges respond to a request to seal all or part of the court's files.

With respect to arbitration, U.S. courts are generally sympathetic to a request to keep proceedings confidential. In a recent New York case, the defendants in an ugly fight over the dissolution of a law firm partnership, asked the court to seal all papers filed in connection with a motion to compel arbitration. See *Feffer v. Goodkind, Wechsler, et al, 578 N.Y.S.2d 802* (N.Y. Sup. Ct., 1991), aff'd, *584 N.Y.S.2d 56* (1st Dep't). The trial court recognized the presumption that court records are public records, but concluded that "litigants ought not be required to wash their dirty linen in public and subjected to public revelation of embarrassing material where no substantial public interest is shown and where the material may have been inserted into court documents for the sole purpose of extracting a settlement of the action." *Feffer, 578 N.Y.S.2d at 803*.

The Feffer trial court sealed the record after it found that the dispute should be arbitrated. The court concluded that papers filed on the arbitrability issue "belong[ed] not in the court, but in the files of the arbitrating body before whom the arbitration [would] be held." Id. While Feffer didn't involve an award, one can assume that the court in Feffer would

have sealed any proceeding to confirm an award once issued. And in two recent proceedings involving reinsurance arbitration awards, (which can't be discussed because they are now under seal), New York State courts sealed confirmation proceedings, although only after questioning both parties about why it was necessary and why the parties hadn't addressed the issue earlier.

Parties intent on sealing an award should also be aware of the practical difficulties encountered when petitioning or moving a court to seal records. For example, the procedure may differ depending on whether you proceed in state or federal court. In a U.S. district court request to seal would occur within an application or motion to confirm, modify, or vacate an award. 9 U.S.C.A. §, § 9-13(West 1999). In New York State, the F.A.A. still applies, but New York adds a procedural gloss. In New York State, the application to confirm, vacate, or modify is a "special proceeding." N.Y. C.P.L.R. § 7502(McKinney's 1999). This "special proceeding" begins with a petition and answer, N.Y. C.P.L.R. § 403, and triggers other rights, e.g., the right under certain circumstances to a hearing or trial.

If the parties intend to keep their filings under seal, it may be necessary to begin with an order to show cause or application to obtain an order sealing the records before the papers are filed. In either federal or district court this brings the parties before a clerk responsible for all sealed records. In both the Southern District of New York and New York Supreme Court, that means speaking to a particular individual who can explain how the sealing will work. The parties are advised to make friends with this clerk and avoid situations in which the records are so securely sealed that the Court that must decide the petition or application doesn't have the moving and responsive papers before it when it comes time to argue the application. One should also keep in mind that the clerk may not be particularly happy with the added administrative burden of labeling, stamping, and segregating sealed records, and should be prepared to work with the court's clerks to facilitate sealing.

The U.K. View

A review of U.K. law relating to the confidentiality of proceedings involving reinsurance arbitral awards is beyond the scope of this article. And it's hard to compare U.S. and U.K. procedures anyway because U.K. and U.S. arbitrations differ considerably. In the U.K. these differences include using barristers and solicitors on arbitration panels (rather than retired or current officers of insurance or reinsurance companies), the prevalence of reasoned decisions, different standards for review and appeal, and other customs and practices that don't exist in the U.S. Having said all this, it's still instructive to examine how U.K. courts have reacted to applications to seal proceedings surrounding an arbitration award.

There's surprisingly little U.K. law on the confidentiality of arbitration proceedings, but two relatively recent cases decided by the same judge illustrate the English approach. See Hassneh Ins. Co. v. Mew (Q.B. 1993) (reprinted in MEALEY'S LITIGATION REPORTS: REINSURANCE, Vol. 3, No. 22(March 24, 1994); Insurance Company and Lloyd's Syndicate (Q.B. 1993) (reprinted in MEALEY'S LITIGATION REPORTS: REINSURANCE, Vol. 5, No. 17 ( January 11, 1995).

In the first case, Hassneh, Justice Colman concluded that the parties to a reinsurance arbitration were under an "implied obligation . . . not to disclose or use for any other purpose" any evidence adduced during the arbitration. The Court found that under English law the parties to an arbitration are "entitled to assume at the least that the hearing will be conducted in private" and that this had been the rule in England for "hundreds of years."

Justice Colman concluded that producing documents exchanged during the arbitration would be "equivalent to opening the door of the arbitration room" to third parties. The Court nevertheless allowed the prevailing party to publish the award as an exception to the rule because the arbitrators' reasoned decision in Hassneh "modified, extended, or interpreted" the contract, and thus had to be made available to brokers and others in order to execute the award.

In the second case, Insurance Co., the Court wouldn't allow the prevailing party in the arbitration to show the award to the following market. The Court found that under the terms of reinsurance contracts the following market hadn't been a party to the arbitration, and wasn't contractually bound by the award. Sharing the award with the following market might be "helpful," but wasn't 'reasonably necessary," particularly where doing so "would divest the award" of its confidentiality. The court therefore enjoined distribution of the award.

The overall result is that in the U.K. reinsurance arbitration awards are "deemed" confidential. The parties to an arbitration enter into an implied "negative agreement" to keep the award and proceedings private, although exceptions may be made so that the award can be executed. U.K. courts do not operate subject to the U.S. presumptions that favor public access to court records. Instead, U.K. courts analyze the confidentiality issue with a focus on the parties' contractual obligations to keep an award confidential.

How to Keep the Award Confidential

Arbitrators generally prefer that the proceedings and the award be confined to the parties, particularly where they, as arbitrators, are bound to keep the proceedings confidential. See ARIAS-U.S. GUIDELINES FOR ARBITRATOR CONDUCT, Canon VI (June, 1998) (Unless otherwise agreed or required, "arbitrators should keep confidential all matters relating to the arbitration proceedings and decision.") Therefore, the arbitrators come to the organizational meeting assuming that the parties will stipulate to confidentiality. To do so, the parties often refer to or adopt ARIAS-U.S. or Reinsurance Association of America ("RAA") forms or drafts for their confidentiality agreements. See ARIAS-U.S., PRACTICAL GUIDE TO REINSURANCE ARBITRATION PROCEDURE (1999); RAA, MANUAL FOR THE RESOLUTION OF REINSURANCE DISPUTES (1997). The parties may now also turn to Reinsurance Dispute Resolution Task Force's PROCEDURES FOR THE RESOLUTION OF U.S. INSURANCE AND REINSURANCE DISPUTES(1999).

The RAA manual contains three forms. One form bars use of any confidential materials, including the award, in "any other legal proceeding, arbitration or any other proceeding whatsoever." RAA MANUAL at 19-20 FM. Read literally, this would prevent either party from submitting the award in a court proceeding to confirm, vacate, or modify. There's no reference to how the award should be treated during the confirmation process.

Another RAA form states that the parties agree that the award shall remain confidential, and that any materials exchanged during the arbitration will be "shredded" at the conclusion of the arbitration or at the conclusion of any "lawsuit to confirm or upset an award." The form, however, doesn't discuss how confidentiality would be assured if one of the parties sought to confirm, modify, or vacate the award. RAA MANUAL at 25-26 FM.

A third RAA form provides that the stipulation of confidentiality survives the conclusion of the hearing, and that the parties "shall take all reasonable and available steps to ensure the continued confidentiality of material(including the award) . . . in connection with the enforcement proceedings, if any, and in any other post-hearing matters." RAA Manual at 21-24 FM. The form, however, doesn't define "reasonable and available steps."

The ARIAS-U.S. Guide contains one draft confidentiality agreement for materials produced during the hearing, including any interim or final award. ARIAS-U.S. Sample Form 3.3. The agreement allows the parties to disclose confidential materials: (a) to retrocessionaires; (b) in connection with court proceedings to confirm, vacate or modify; (c) to auditors or regulators; and (d) as necessary to comply with subpoenas, discovery requests, or court orders. With respect to (b), the stipulation further provides that the parties shall "agree, subject to court approval, that all submissions of Arbitration Information to a court shall be sealed."

The sample form further provides that in "all contexts, both parties will make good-faith efforts to limit the extent of the disclosures, if any, to be made, and will cooperate with each other in resisting or limiting disclosure of Arbitration Information." ARIAS-U.S. Sample Form 3.3.

The Task Force's suggested procedures include a provision that makes all meetings and hearings "private and confidential." PROCEDURES, Art. 7.1 at 8. The parties are required to "use their best efforts to maintain the confidential nature of the arbitration proceedings and the Award." PROCEDURES, Art. 7.2 at 8. The procedures make an exception for "judicial proceeding(s) relating to the arbitration or the Award," but require that the parties use their best efforts to maintain confidentiality with respect to the exception, "including the filing of pleadings under seal when permitted." Id.

Of course, many parties to an arbitration draft their own confidentiality agreements. In our experience, however, few of these agreements address how the award can be protected during post-award proceedings.

Proposed Additional Stipulation

Before the arbitration gets underway, the parties may consider stipulating that if either party moves or petitions any court to confirm, modify, or vacate the award, the moving or petitioning party must ask the court to place the proceeding, and the award itself, under seal. The parties might further stipulate that both parties will join in the moving party's application to seal the record, and that both parties shall bring to the court's attention not only the terms of their stipulation, but industry custom and practice and any other reasons why the award should be sealed.

The stipulation would read as follows:

The parties stipulate and agree that if either party moves or petitions to confirm, modify, or vacate any interim or final award, the moving or petitioning party shall ask the court to place the proceedings and the award under seal pursu-

ant to the court's inherent authority over its own records, and whatever rules, statutes, or procedures exist to seal the court's records.

The parties further stipulate and agree that both parties will: (1) join in the application to seal the proceedings and the award; and (2) bring to the court's attention all relevant reasons why the award and any proceedings to confirm, modify, or vacate the award should not be included in the court's public records.

An agreement along these lines doesn't guarantee that the award stays out of the public record, but, at the very least, it requires that both parties take specific steps to keep the award confidential.

\* \* \*

Most courts are willing to work with arbitrating parties to preserve confidentiality. The parties to a reinsurance arbitration should recognize, however, that U.S. courts operate under a presumption that documents filed with the court are public records. U.S. courts require reasons why sealing a record is necessary, and in the public interest. A joint application that provides these reasons would help keep reinsurance differences in the kitchen, and out of the front yard.

Contact Mealey's at 1-800-MEALEYS and see today's headlines at www.lexis.com/legalnews. To see if there is a Mealey's Conference on this topic or an online CLE session, please visit: http://www.mealeys.com/conferences.html.

**EDITOR-NOTE:**
[Editor's Note: James Veach is a partner in Mound, Cotton & Wollan's New York office. His practice includes reinsurance arbitration, litigation, and regulation, as well as insurer and reinsurer insolvency. Copyright 1999 by the author. Replies to this commentary are welcome.]

**LOAD-DATE:** February 9, 2000